## Chicago & N. W. Ry. Co. v. G. F. Gillison.

1.  MASTER AND SERVANT.—*Inspection of Machinery.*—The proper and reasonable inspection of machinery furnished to the servant for use in his employment is a duty incumbent on the master, and while the master may perform this duty by another, and, if a corporation, must do so, the duty can not be delegated so as to exempt the master from liability for injuries occasioned by its omission or negligent performance.

2.  RAILROAD COMPANIES.—*Duty to Inspect Machinery.*—It is the duty of a railroad company to inspect, from time to time, the appliances on its own cars; *a fortiori* it is its duty to inspect, before attaching to its

train, the appliances on the cars of another company, which it had not previously inspected, and the sufficiency or insufficiency of which it could only ascertain by such inspection.

3. EVIDENCE.—*Opinions of Witnesses, When Competent.*—When the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them, without the aid of the judgment or opinion of the witness who had the benefit of personal observation, the witness is allowed, to a certain extent, to add his conclusion, judgment or opinion.

4. PERSONAL INJURIES.—*Proximate and Remote Causes.*—The question of proximate cause is not to be determined by minute niceties. A wrongdoer is at least responsible for all the injuries which result, as the natural consequences, from his misconduct—such consequences as might reasonably have been anticipated as likely to occur.

**Trespass on the Case,** for personal injuries. Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presiding. Heard in this court at the October term, 1897. Affirmed. Opinion filed December 16, 1897.

E. E. OSBORN, attorney for appellant; A. W. PULVER and LLOYD W. BOWERS, of counsel.

JAMES B. McCRACKEN and ALBERT M. CROSS, attorneys for appellee.

MR. PRESIDING JUSTICE ADAMS DELIVERED THE OPINION OF THE COURT.

A freight train of the appellant, bound for Chicago, arrived at Rochelle, Illinois, on the evening of May 23, 1894. The crew of the train consisted of G. F. Gillison, the appellee, head brakeman; E. A. Mahlman, rear brakeman, and Hennings, conductor. The conductor, Hennings, ordered Mahlman to get out two empty cars which were standing on a side track north of the depot, which was called the "House Track." The empty cars stood on the house track, northwest from the depot, next east of the two empty cars on the house track, and northeast from the depot were two box cars, and east of the two box cars were two gondola cars filled with stone, the gondola cars being flat cars with low sides. There were two main tracks at

Rochelle, south of the depot, and the freight train was on the north main track headed east. North of the track on which the train was, and south of the depot, was another side track called the " main side track." At some distance east of the depot there was a switch connecting the house track with the main side track, and still further east was another switch connecting the main side track with the main track on which the train was. In order to take out the two empty cars, which stood furthest west on the house track, it was decided to pull seven box cars attached to the engine east and past the two switches above mentioned, then back west, through the switches, onto the house side track, couple the cars on that track as they were reached, pull all thirteen cars east through the switches and onto the main track, and then separate the two box cars and the two gondola cars taken from the house track from the empty cars wanted, in the usual way. Mahlman went ahead of the backing cars to couple the cars on the house track, and Gillison, while this was being done, stood on the car next to the engine, receiving signals from Mahlman and repeating them to the engineer.

When the coupling was complete, Mahlman climbed on the last car of the train, and Gillison, head brakeman, was on the car next the engine, when a signal was given to the engineer to go ahead, which he proceeded to do. When the engine reached the main side track switch, Gillison got off the car to throw the switch. The side track switch curved to the south, and Gillison got off the car a little west of the main side track switch, or the concave side of the curve, at a point where he supposed the engineer could see his signals, for the purpose of throwing the switch. He was then about between the two main tracks. While standing there he saw that the train had broken in two. He immediately called to Mahlman, who was then hanging on the south side of the third car from the rear (counting last car in train one), that the train had broken in two. He called several times before Mahlman understood him. As soon as he understood him, he, Mahlman, climbed on top of

the car, set one brake, and was proceeding to set another, when the cars collided. The house side track had a down grade toward the southeast. Gillison, while calling to Mahlman, also signaled the engineer, and then immediately climbed the ladder on the side of the box car next behind the gondola cars, which was the fourth car from the rear, set one brake and started for the other, when the front and rear sections of the train collided, and he was thrown from the car and his right leg was run over and crushed so as to necessitate amputation.

.The evidence shows that the break occurred between the two gondola cars, which were laden with stone. The accident occurred about 10 o'clock P. M., and it was very dark. The train, at the time of the collision, was running from five to seven miles an hour. The witness, Mahlman, testified that the train broke in two between the two cars of stone; that the drawbar between those cars broke; that he examined it on the side track in about two hours after the accident, as nearly as he could fix the time; that it was broken right back of the head, close up to the car; that as nearly as he could describe the break, it seemed it was an old break; it was rusty; the upper half of the draft-iron was bright and the lower half, or about half, was rusty.

The witness describes the draft-iron as being six or seven inches square, not solid, but hollow, and says that he does not know the thickness of the metal around the hollow part.

Mahlman, testifying on direct examination as to what he did after coupling the two gondola cars to the seven cars attached to the engine, and which were backed up on the side track, says: "Then I walked back to see whether the coupling was made between the two cars of stone, and everything looked all right, and I walked further on. I looked for bad order marks, but I could not find any. I will say I did not look very close, but as a rule you can find them outside of the car. I did not see any." On cross-examination he testified: "I examined the coupling between the two stone cars and found it all right. I just looked to see whether they were coupled, and to see whether everything was all

right. I just went in and held up my lamp close to the draft-irons and looked to see if everything was all right. I went between the cars where there was room for me to step in; I held my lamp up to the draft-irons, and everything appeared to be all right." The evidence as to what signals were given and what received by the engineer is substantially as follows: Mahlman and Gillison both testified that, when the cars were all coupled on the side track, a signal was given to the engineer to go ahead. Gillison says Mahlman gave the signal to him and he to the engineer. Mahlman testifies that, afterward, and when Gillison "hollered" to him that the train was broken in two, he saw Gillison give the go-ahead signal to the engineer with his lantern. Gillison testifies that, at that time, he gave two signals to the engineer—the go-ahead signal and the break-in-two signal—but Mahlman says he did not see the latter, but only the former signal.

Van Black, the engineer, called by the appellant, testified: " I received signals just prior to the time that Gillison was hurt. I was pulling the train out on the main track; my engine was out on the main track, beyond the main side track switch, going east; I was on the right hand side of the engine, or the south side; my head was out of the window; I was looking west, looking back for a signal; I got signals made with a lantern; the man that gave me the signals was standing between the two main tracks, between the south and the north main; I should judge he was just about opposite the main side track switch. He gave me a stop and back-up signal; a signal across the track and then a signal to back up. At the time I got that signal my train was running probably five or six miles an hour. I did not get any other signal than that I describe. Upon receipt of that signal I stopped and started to back up; I applied the air, and the engine came to a full stop, and I started to back up. The engine had just started to move when I felt the rear—felt the cars run into the forward portion of the train, but I had not moved possibly over a foot."

The plaintiff's right leg was amputated twice, the first

time at the Delos Hotel in Rochelle, where he was confined for six weeks; the second time at St. Luke's Hospital in Chicago; the last amputation being about four and one-half inches below the hip.    He had been earning as brakeman $60 per month.    Since the injury he has not been able to work as a brakeman.    The jury found the defendant guilty and assessed damages at the sum of $18,000; a remittitur was entered of $8,000 and judgment was rendered accordingly, to reverse which this appeal was taken.

Appellant's counsel contend, first, that there is a variance between the declaration and the evidence, in that the declaration avers that the coupling apparatus broke when subjected to the strain incident to the starting of the train, whereas the evidence is that it did not break until after the train started.    We do not think this a material variance. The material part of the allegation is that the coupling broke, and whether it broke at the instant of starting or subsequently, and by reason of the strain to which it was subjected on starting, and the continued strain resulting from the car being drawn along, is immaterial.

Counsel further contend that the evidence fails to establish that appellant knew of the defective condition of the drawbar, or that by the exercise of ordinary care it might have known of it.

The evidence shows that Mahlman, appellant's brakeman, discovered the defect about 12 o'clock in a dark night by the light of a lantern; that he found that the lower half of the break in the drawbar was rusty and seemed to be an old break, and that the upper half of it was bright. We are of opinion that this was evidence from which the jury might reasonably infer that appellant, in the exercise of ordinary and reasonable care, might and could have discovered the defect.

In Spicer v. South Boston Iron Co., 138 Mass. 426, cited with approval in Sack v. Dolese et al., 137 Ill. 135, James W. Harvy, a witness for plaintiff, testified that he had seen and examined the hook in question, and had discovered a crack or flaw about half an inch above the flaw, at the place

of the rupture which caused the accident. The hook in question was an S hook, and was used to sustain heavy weights. The court say: "The fact that there was actually a visible crack or flaw in the hook above the flaw at the place of rupture, and that, as testified to, iron will usually break in the weakest spot, taken together, tended to show that a careful inspection would have revealed the weakness of the hook."

In Union Pac. Ry. Co. v. Daniels, 152 U. S. 684, which was an action for injuries occasioned by a defective wheel, the court say: "The evidence tended to show that Daniels was a brakeman in the employment of the company, and in the discharge of his duties as such, April 3, 1887, on a freight train made up at Green River, and running thence westward, that he was ordered on top of the train to set the brakes at different points going down a long hill, and was so engaged when the train was suddenly wrecked, and he was severely injured; that a wheel on one of the cars of the train had an old crack in it, some twelve inches long, which rendered it unsafe; that the wheel gave way by reason of the fracture and thus the disaster occurred; and that, although the crack, being old, was filled with greasy dirt and rust, it could have been detected without difficulty if the wheel had been properly examined at Green River, which was an inspecting station, at which trains were made up.

Upon the inferences properly deducible from such evidence, the rule applied, which requires of the master the exercise of reasonable care in furnishing suitable machinery and appliances for carrying on the business for which he employs the servant, and in keeping such machinery and appliances in repair, including the duty of making inspections, tests and examinations at the proper intervals. As observed in Hough v. Railway Co., 100 U. S. 218, the duty of a railroad company in that respect to its employes is discharged when, but only when, its agents, whose business it is to supply such instrumentalities, exercise due care as well in their purchase originally, as in keeping and maintaining them in such condition as to be reasonably and adequately

safe for use by employes; and the company 'can not in respect of such matters interpose between it and the servant, who has been injured, without fault on his part, the personal responsibility of an agent who, in exercising the master's authority, has violated the duty he owes, as well to the servant as to the corporation.' "

In Seese v. Nor. Pac. Ry. Co., 39 Fed. Rep. 487, in Circuit Court, Dist. Minnesota, which was an action by a brakeman to recover damages for an injury to his hand while coupling cars, there was evidence tending to show that the bolts which went into the dead-wood were sunk into the timber, and let the draw-head down four inches too low; that the defect was not recent, but old, and that the plaintiff did not know of it.   Held, that it was a proper case to go to the jury on the evidence.   There was a defect in the rod of a brake, which the court, in its opinion, describes as "an ancient flaw or crack extending obliquely about two-thirds into its body."   The plaintiff, a brakeman, was injured by falling from a freight car, by reason of the breaking of the rod while he was operating it.   The jury found specially that neither the plaintiff nor defendant had knowledge of the defect, but the court held that the plaintiff was entitled to recover, saying:   " In the present case all the conditions exist upon which the defendant's responsibility depends, and none by which it can be removed.   The plaintiff had no knowledge nor information nor opportunity for examination of the defective rod, and the hazard of its continued use, and was performing his duty when it parted under the strain, and he fell.   Had the proper examination been made by the defendant, and the rod repaired and strengthened, the accident would not have occurred, and hence it must be ascribed to the defendant's own dereliction of duty."   Johnson v. Richmond & D. R. R. Co., 81 N. C. 453; see also Mobile & O. R. R. Co. v. Harmes, 52 Ill. App. 649; Warden v. Old Colony R. R., 137 Mass. 204.

Ignorance of defects in instrumentalities used by the servant is no defense as to the master.   Benzing v. Steinway et al., 101 N. Y. 547.

In Bailey v. Rome, W. & O. R. R. Co., 49 Hun, 377, the court in its opinion states the evidence thus :

" The evidence shows that the plaintiff was employed as a brakeman on a freight train of the defendant, running from Norwood to Rome. On the day of the accident, after the train had been made up at Norwood ready to start, five flat cars loaded with railroad iron were placed in the train next to the engine, and the train, consisting of thirty cars, then proceeded to DeKalb Junction. The train having then stopped at that station, was started again with a view of placing it on a side track, moving upon a down grade. The plaintiff in the performance of his duty attempted to set the brake on the fourth flat car from the engine, and swayed upon the wheel in the usual manner, when the brake rod came out and he was thrown from the car and injured by the moving train. On examination after the injury it was found that the pin in the bottom of the brake rod, designed to hold the rod in place, was gone. There is no evidence how long this defective condition of the brake had existed. The plaintiff testified that the rod came out easily when he swayed upon it. The absence of the pin could not have been seen by one working the brake, but an inspection of the brake from under the car would have disclosed its absence."

The trial court took the case from the jury and gave judgment for the defendant. But the Court of Appeals reversed the judgment, saying : " In this case the company had provided for a proper inspection, which, if it had been made would have led to the discovery of the defective condition of the brake at Norwood, assuming that the pin was not in the rod when the train started from that place. The rule required an inspection at that point, and if due inspection was omitted there, and the injury resulted from a defect then existing, a case was made for the jury, because the master is never exonerated by the negligent omission of a subordinate to perform duties which are imposed upon him in his character as master, resulting in injury to other employes. We think there was enough shown from

which the jury might infer that the pin was not in the rod when the train left Norwood, and that the failure to discover the defect there, was in consequence of the omission to properly inspect the car at that point."

Counsel for appellant seem to lay stress on the examination made by Mahlman when coupling the cars prior to the accident. It is evident from the testimony of Mahlman, which has been substantially quoted, that his examination was mainly for the purpose of ascertaining that the gondola cars were properly coupled, and not at all for the purpose of determining whether the couplings were sound and in good condition, and that his examination or cursory inspection was not at all equivalent to a careful inspection such as the law requires.

The proper and reasonable inspection of instruments or machinery furnished to the servant for use in his employment is a duty incumbent on the master, and while the master may perform this duty by another, and, if a corporation, must so do, the duty can not be so delegated as to exempt the master from liability for injuries occasioned by its omission or negligent performance. 2 Bailey's Pers. Inj., etc., Sec. 2618; Un. Pac. Ry. Co. v. Daniels, 152 U. S. 689.

In Sack v. Dolese et al., *supra*, the court, commenting on the duty of inspection, say: " In the operation of cars a most efficient and, perhaps, a necessary method of discharging that duty, is to maintain a careful system of inspection, to see that the necessary appliances in use thereon are in good order and sufficient to answer the purposes for which they are intended." In the present case there is no evidence that there was any inspection whatever, the cursory and superficial examination of Mahlman, while coupling the cars, not being worthy the name of inspection.

Appellant's counsel object that the evidence is insufficient to support the averment that the draft-iron broke by reason of the strain incident to starting, and that the more reasonable conclusion from the evidence is, that it was broken by the force of the collision. We are of opinion that the evidence was sufficient to warrant the jury in finding that the draft-iron broke from the former cause.

The objection that there is no evidence that the gondola cars were appellant's cars, if at all material, is untenable. The evidence is that the gondola cars were on the appellant's side track, and therefore in its possession, which, in the absence of evidence to the contrary, was sufficient proof of the ownership of appellant.    But the question is immaterial, because whether the cars belonged to appellant or to another railway company, the duty of inspection was the same. Buswell on Pers. Inj., Sec. 197; Sack v. Dolese et al., 137 Ill. 129; Mobile & O. R. R. Co. v. Harmes, 52 Ill. App. 649.

This rule is eminently just.    If it is the duty of a railroad company to inspect, from time to time, the appliances on its own cars, *a fortiori*, it is its duty to inspect, before attaching it to its train, the appliances on the car of another company, which it had not previously inspected, and the sufficiency or insufficiency of which it could only ascertain by inspection.

The evidence shows that the car, the draw bar of which broke, was in a different place on the side track from where it was when the collision occurred, when, about two hours after the collision, Mahlman examined the draw bar, and appellant's counsel object that an examination two hours after the collision, and in view of the difference of location of the car, is not sufficient to sustain the averment that the draft-iron broke, as averred in the declaration.    In support of this proposition, appellant's counsel cite the following cases:    In Perry v. Mich. C. R. R. Co., 65 N. W. Rep. 608, the complaint was of improper inspection and the putting into the train a car having defective draft-irons, and the court say:    "There was no evidence whatever that the car was defective at the time it was put on the train.    On the other hand, the testimony of the defendant shows that it was in good condition at that time."

The defendant's car inspector testified that he inspected the car the morning of the day the plaintiff was injured, and found it in good condition, and nothing out of order.

In Penna. Co. v. Marion, 27 Am. & Eng. R'd Cases, 132, it was held that evidence of the condition of a platform

in March was not admissible evidence of its condition in December of the next preceding year, in the absence of evidence that in both those months the condition was substantially the same.

In Little Rock & Ft. Smith R. R. Co. v. Eubanks, 31 Am. & Eng. R'd Cases, 176, which was an action for injury occasioned by a defective track, certain witnesses testified to the condition of the track the morning after the accident. The court say: " When a defective track is alleged to be the cause of the casualty, it is often impracticable to adduce evidence of the condition of the track at the precise moment the casualty occurred. It is enough to prove such a state of facts, shortly before or after, as will induce a reasonable presumption that the condition is unchanged."

In Stoher v. St. L., I. M. & S. R. R. Co., Ib. 229, the plaintiff was injured by the embankment on which the track was constructed giving way. The accident occurred May 9, 1880. It was held that evidence of the condition of the track in the spring of 1883 was inadmissible, but the court say : " It will, we think, ordinarily be sufficient to show the state of facts tending to show negligence in the construction and maintenance of the railroad, at the time, or recently before or after, and within such reasonable time as will, from the nature and circumstances of the case, induce or justify a reasonable presumption or inference that the condition is the same." Ib. 233–4.

Neither the foregoing cases nor others cited by appellant's counsel support their contention; on the contrary, the last two cases quoted are diametrically opposed to it.

The testimony of the witness, Mahlman, as to the condition of the draw bar, was clearly competent. City of Bloomington v. Osterle, 139 Ill. 120; Chicago, P. & St. L. Ry. Co. v. Lewis, 145 Ill. 67.

Objection was made on the trial to the testimony of Mahlman that the brake was rusty and seemed to be an old one, and while the assignments of error are, perhaps, sufficiently comprehensive to include the objection, appellant's counsel have not noticed it in their argument, and may,

C. & N. W. Ry. Co. v. Gillison.

therefore, be presumed to have abandoned it.   It was not within the power of appellee to produce the draft-iron on the trial, and it was not produced by appellant, therefore, the testimony of Mahlman, who examined it, as to how it appeared, was competent.

" When the facts are of such a character as to be incapable of being presented with their proper force to any one but the observer himself, so as to enable the triers to draw a correct or intelligent conclusion from them, without the aid of the judgment or opinion of the witness who had the benefit of personal observation, he is allowed, to a certain extent, to add his conclusion, judgment or opinion." Bates v. Town of Sharon, 45 Vt. 474; Atchison, T. & S. F. R. R. Co. v. Miller, 39 Kan. 419; Yahn v. City of Ottumwa, 60 Ia. 429; 2 Jones on Law of Ev., Sec. 362; 1 Wharton on Law of Ev., 2d Ed., Sec. 511, and cases cited; Brennan v. People, 15 Ill. 511.

Counsel for appellant further contend that the proximate cause of the injury was the collision, and not the breaking of the draft-iron, and that the risk of the collision was a risk assumed by the appellee.

The question of proximate cause is not to be determined by minute niceties.   For instance, it might be said of a shot fired by A, which killed B, that the proximate cause of the killing was not the pulling of the trigger, thus causing an explosion and the forcible ejection of the bullet, but the impact of the bullet on the person of B, and its penetration of his person.   The latter must certainly be deemed to have been the ultimate or final cause, yet it could not be held that the firing of the shot was not, in law, the proximate cause of B's death.

Counsel contend that there was a sufficient cause intervening between the breaking in twain of the train and the collision between the two sections of it, to account for the collision, viz., the stoppage of the forward section of the train by the engineer.   We are of opinion that the evidence, to say the least, tends to show that the engineer stopped the forward section after the breaking in two of the train,

and the question is whether, if the engineer so did, it would defeat appellee's action.

Ransier v. Minneapolis &. St. L. Ry. Co., 32 Minn. 331, was an action for injury alleged to have been occasioned by a defective brake, and in that case, as in the present, it was claimed that the collision resulting in injury to the plaintiff was immediately caused by the stoppage of the forward section of the train by the engineer, and therefore the defective brake could not be regarded as the proximate cause. In respect to this objection the court say: "According to the unopposed testimony of the brakeman, whose competency is not questioned, it may be considered that the coupling would not have broken except for the sudden release of the defective brake. The breaking apart seeming to have been a natural result—a result likely to occur from the use of the defective brake in the ordinary operation of the train—is legally referable to the defect complained of as its proximate cause, and the other concurring influence does not affect the responsibility of the defendant. Griggs v. Fleckenstein, 14 Minn. 81; Johnson v. Chicago, M. & St. P. Ry. Co., 29 Minn. 425; McMahon v. Davidson, 12 Minn. 357; Campbell v. City of Stillwater, 32 Minn. 308.

The subsequent collision is further removed from that cause in the order of events, but is it so in its causal relation? The answer, upon principles recognized as being within the scope of the maxim *causa proxima non remota spectatur*, is not difficult. The principle is well settled that a wrongdoer is, at least, responsible for all the injuries which resulted as natural consequences from his misconduct—such consequences as might reasonably have been anticipated as likely to occur. Griggs v. Fleckenstein, *supra;* Nelson v. Chicago, M. & St. P. Ry. Co., 30 Minn. 74; Johnson v. Chicago, M. & St. P. Ry. Co., *supra;* Martin v. North Star Iron Works, 31 Minn. 407; Savage v. Chicago, M. & St. P. Ry. Co., Id. 419; Milwaukee & St. P. Ry. Co. v. Kellogg, 94 U. S. 469; Lane v. Atlantic Works, 111 Mass. 136; Hill v. Winsor, 118 Mass. 251; Fairbanks v.

C. & N. W. Ry. Co. v. Gillison.

Kerr, 70 Pa. St. 86; Sheridan v. Brooklyn City, etc., R. Co., 36 N. Y. 39; Lake v. Milliken, 62 Me. 240; Weick v. Lander, 75 Ill. 93. And whether the injury in a particular case was such natural and proximate result of the wrong complained of, is, ordinarily, for the determination of a jury. See cases above cited."

Weick v. Lander, 75 Ill. 93, cited *supra*, fully sustains the doctrine announced by the Minnesota court. The doctrine there announced is in accord with the holding in Scott v. Shepard, 2 Sir Wm. Bl. 342. In that case, while the judges differed as to whether the action should be trespass or case, they were unanimous in holding that Shepard, who first threw the squib, was liable to the plaintiff for the ultimate consequence, notwithstanding that new directions were subsequently given to it by third persons, upon the ground that the original throwing was unlawful.

What was the proximate cause, was a question for the jury. Ransier v. Ry. Co., *supra;* Pullman Pal. Car Co. v. Laack, 143 Ill. 242, 259; Distler v. Long Island R. Co. (N. Y.), 45 N. E. Rep. 937; 2 Bailey's L. of Pers. Inj., etc., Secs. 1028, 1033, 1042.

It is clear that the train would not have broken had it not been for the defective draft-iron, and therefore the utmost that appellant can claim is, that the breaking of that iron and the stoppage of the forward section of the train by the engineer, combined to produce the collision. But this can not avail appellant as a defense.

In Pullman Pal. Car Co. v. Laack, *supra*, the court say : " It is well settled that when the injury is the result of the negligence of the defendant and that of a third person, the plaintiff may recover, if the negligence of the defendant was an efficient cause of the injury," and in the same case the court say :  " If, therefore, the wrong of the appellant put in motion the destructive agency, and the result is directly attributable thereto, and there was no intervention of a new force or power of itself sufficient to stand as the cause of the mischief, the negligence of appellant must be considered the proximate cause of the injury."

Eliminating from the case the defective draft-iron and the breaking of it by reason of its defective condition, it can not reasonably be said that the stoppage of the train by the engineer was the intervention of a new force of itself sufficient to stand as the cause of the mischief.

In Warden v. Old Col. R. R. Co., 137 Mass. 204, the court say : "It was the duty of the defendant to provide suitable means for keeping the rope in a safe condition, and neglect of that duty would be the direct negligence of the defendant, for which it would be liable, even if the negligence of a fellow-servant contributed to the injury." Union Pac. Ry. Co. v. Callaghan, 56 Fed. Rep. 988, and cases cited.

This is an instructive case on the question of proximate cause. The court say : "In considering these questions, it must always be borne in mind that the proximate cause is not always nor generally the act or omission nearest in time or place to the effect it produces."

Counsel asserts that the risk of a collision between the rear and forward section of the train was assumed by appellee. It is not claimed by counsel that appellee was negligent in getting upon a car of the train, after the train broke in two, for the purpose of preventing a collision, if possible. On the contrary, counsel for appellant admit that it was appellee's duty so to do. The contention of counsel is based on the legal proposition that when appellee entered in the employment of brakeman for appellant, he assumed the ordinary risks or hazards of that employment. As an abstract legal proposition, this is correct, but it has no application to the facts of the present case. The omission by appellant of a duty incumbent on it by law, was not a risk assumed by appellee.

In Pullman Pal. Car Co. v. Laack, *supra*, the court say : "As a general rule, the servant assumes the natural and ordinary risks of the business in which he engages, and is held to impliedly contract that the master shall not be liable for injuries consequent upon the negligence of a fellow-servant, in the employment of whom the master has exercised proper care, but he does not assume or contract

to waive liability of the master for his own negligence, whether committed in person or by an agent authorized by the master to perform a duty resting upon him. In such case, the master being under contract duly to perform, the servant may, without sufficient appearing or being shown to put him upon notice to the contrary, rely upon the due and reasonable performance of the duty. The law will not permit the master to evade the duty which it has cast upon him, by shifting it upon another." What is here said is amply sustained by authority.

October 8, 1896, appellee, by leave of court, filed an additional count to his declaration, to which appellant pleaded the statute of limitations, claiming that a new cause of action was stated in the additional count, to which plea the appellee demurred, and the demurrer was sustained by the court. This is assigned as error. Appellant filed a written motion for a new trial in the trial court, in which were specified the grounds of the motion, but the sustaining the demurrer was not specified as a ground of the motion; it must therefore be held to have been waived, and can not be considered on this appeal. Stuve v. McCord, 52 Ill. App. 331; Ottawa, O. & F. R. V. R. R. Co. v. McMath, 91 Ill. 104.

Finally, appellant objects that the judgment is excessive. We would not feel warranted in disturbing the judgment on that ground.

Appellant's counsel do not, in their brief, complain that there was any error in the giving or refusing instructions.

The judgment will be affirmed.